UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRIENDS OF TRUMBULL, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 4518 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CHICAGO BOARD OF EDUCATION and | ) | |
| BARBARA BYRD-BENNETT, Chief Executive Officer | ) | |
| of the Chicago Board of Education, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Facing massive budget shortfalls, the Chicago Board of Education decided in 2013 to close dozens of public schools. Citywide protests followed. So did the lawsuits, including this one brought against the Board of Education and its Chief Executive Officer (together, "Board") by, among others, Friends of Trumbull, an unincorporated association whose purpose was to advocate for resources to meet the educational needs of Lyman Trumbull Elementary School in Chicago's Andersonville neighborhood, one of the schools slated for closure. Friends alleges that the utilization formula used by the Board to determine which schools were eligible for closure unfairly penalized Trumbull—which had a relatively high proportion of students with disabilities—in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Doc. 21. The Board has moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. Doc. 132. The motion is granted.

**Background**

As on a Rule 12(b)(6) motion, the court on a Rule 12(c) motion assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See*

1

*Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014) ("A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)."); *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the non-movant's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012). To the extent that an exhibit contradicts the complaint's allegations, the exhibit takes precedence. *See Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). The following facts are set forth as favorably to Friends as permitted by those materials.

In 2013, the Chicago Public School District "ha[d] space for over 511,000 students, but only 403,000 [we]re enrolled. Nearly 140 schools [we]re more than half empty." Doc. 21-1 at 8. Believing this underutilization to be partly responsible for the District's $1 billion fiscal deficit, *id.* at 7, the Board announced the possible closing of more than 50 public schools, including Trumbull. Doc. 21 at ¶ 35. Following public hearings in April 2013, the Board voted in May to close Trumbull and 49 other schools. *Id.* at ¶¶ 36, 42.

The Board determined that Trumbull was eligible for closure because although the school could accommodate between 576 and 864 students, it had only 389. *Id.* at ¶ 37. According to the Board's "Utilization Standard," a school's "ideal" enrollment was calculated by (1) multiplying the school's total number of classrooms by 0.76 (the assumed fraction of general purpose classrooms, as opposed to ancillary or special purpose rooms, in a typical school); and

then (2) multiplying that result by 30 students (the assumed ideal number of students per classroom). *Id.* at ¶¶ 26-29. The Board considered a school to have acceptable "enrollment efficiency" if its enrollment was within 20 percent of the ideal. *Id.* at ¶ 27. Accordingly, a school with an enrollment below 80% of its ideal was considered underutilized. *Id.* at ¶ 29. Trumbull's 389 students amounted to just 54% of its ideal enrollment of 720; to reach acceptable enrollment efficiency, Trumbull would have needed at least 576 students. *Id.* at ¶ 43.

The Utilization Standard took into account neither a school's actual number of general purpose classrooms nor its population of special needs students, who require class sizes of far fewer than 30 students. Of Trumbull's 31 classrooms, only 21 were general purpose classrooms—and 6 of the 21 were reserved for special education classes. *Id.* at ¶ 20. Each special education class had roughly 8 to 12 students, *id.* at ¶ 22, and Friends alleges that "[t]he lower student-to-teacher ratio in the special education classrooms constitute[d] a crucial feature of Trumbull's education program," *id.* at ¶ 23. Of Trumbull's 389 students in the 2012-13 school year, 135 required special education services, 70 of them full time. *Id.* at ¶ 21. Had the Board taken into account Trumbull's actual population and classroom allocation, it would have concluded that "Trumbull's utilization [wa]s about 70%" instead of 54%. *Id.* at ¶ 44. The Board announced at one point during the closure process that only schools with utilization rates lower than 70% would be vulnerable to being closed. *Id.* at ¶ 34.

Joined by three Trumbull students and their mothers, Friends filed this suit in June 2013. Doc. 1. The operative complaint alleges that the Board's decision to close Trumbull on the basis of the Utilization Standard violated the Rehabilitation Act, Doc. 21 at ¶¶ 55-73; the ADA, *id.* at ¶¶ 74-90; and the Illinois School Code, *id.* at ¶¶ 91-109. Friends alleges that the Board's decision forced it to "divert efforts and resources from its mission of raising funds to further

3

Trumbull's educational programs" to "opposing Defendants' discriminatory actions, and advocat[ing] against Trumbull's closure." *Id.* at ¶¶ 73, 90. Shortly after the suit was filed, Plaintiffs moved for a preliminary injunction to enjoin the school's closing. Doc. 22. On August 13, 2013, after an expedited evidentiary hearing, the court denied a preliminary injunction and, with Plaintiffs' agreement, dismissed the state law claim without prejudice to Plaintiffs' refiling that claim in state court. Doc. 82. The Board closed Trumbull before the 2013-2014 school year. Doc. 136 at 1-2.

The individual plaintiffs ultimately reached a settlement with the Board and voluntarily dismissed their claims, leaving Friends as the only remaining plaintiff. Docs. 119, 126. The Board moved under Rule 12(b)(1) to dismiss Friends' claims for lack of Article III standing, Doc. 112, and the court denied that motion in an oral ruling, Doc. 128. The Board then moved under Rule 12(c) for judgment on the pleadings, arguing that Friends does not fall within the class of plaintiffs that the ADA or the Rehabilitation Act were meant to protect. Doc. 132.

**Discussion**

Friends' claims that the Board's use of the Utilization Standard to determine which schools would be closed, and its decision to close Trumbull, violated the ADA and the Rehabilitation Act. The Board seeks judgment on the ground that Friends is outside the statutory "zone of interests" of the ADA and the Rehabilitation Act. "Whether a plaintiff comes within the 'zone of interests' is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (internal quotation marks omitted). Put differently, the court must determine

"whether [Friends] falls within the class of plaintiffs whom Congress has authorized to sue under" the ADA or the Rehabilitation Act. *Ibid*.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Other than some minor differences not relevant here, the statutes are coextensive," so the court will for ease of exposition refer to both statutes simply as the ADA, except where the distinction may be relevant. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014); *see also Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003) ("the ADA and the [Rehabilitation Act] … run along the same path and can be treated in the same way").

The ADA's enforcement provisions "extend[] relief not just to 'qualified individuals with a disability,' but to 'any person alleging discrimination on the basis of disability,'" as well as to "'any person aggrieved' by discrimination on the basis of disability." *Discovery House*, 319 F.3d at 279 (quoting 42 U.S.C. §§ 12132, 12133 and 29 U.S.C. § 794a(a)(2)). Friends essentially argues that "the breadth of these provisions" allows more or less *anyone* to sue "based upon discrimination against individuals" as long as the plaintiff is in some way "associated" with the individual victim(s). Doc. 136 at 5. That is a breathtaking proposition—if correct, it would mean that virtually anyone could file an ADA suit as long as they have some association with

someone, somewhere, who has a disability and who has been plausibly subjected to discriminatory action. So, for example, Andersonville shops or restaurants that were patronized by Trumbull parents and students, and whose businesses suffered as a result of Trumbull's closure, or condo associations to which students' families belonged and which lost revenue when those families relocated to other neighborhoods in response to Trumbull's closure, could sue the Board as well. That cannot be right.

And indeed it isn't: the Supreme Court has held that to fall within a statute's zone of interests, "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523-24 (1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)). At issue in *Postal Workers* was the validity of a regulation, promulgated under the Private Express Statutes, 18 U.S.C. §§ 1693-1699 and 39 U.S.C. §§ 601-606, allowing private couriers to handle certain international mail delivery, which was thought to have the likely effect of reducing the number of federal postal jobs. 498 U.S. at 519-20. The postal workers union brought suit under the Administrative Procedures Act ("APA"), alleging "that the rulemaking record was inadequate to support" the regulation. *Id*. at 520. Applying the above-quoted rule, the Supreme Court held that the union did not fall within the zone of interests of the Private Express Statutes and thus could not maintain the suit, reasoning that the "particular language of the statutes … indicate[s] that the congressional concern was not with opportunities for postal workers but with the receipt of necessary revenues for the Postal Service." 498 U.S. at 524-26. So even though the

regulation would have the effect of eliminating postal jobs—obviously of primary concern to a union—the union fell outside the statute's zone of interests. *Ibid*.

Friends' position is even weaker than that of the union in *Postal Workers*, for it alleges only that its mission is to "advocate on behalf of Trumbull's parents and children for resources to meet the educational needs of Trumbull's children," some of whom happened to have disabilities. Doc. 21 at ¶ 12. Nowhere does Friends allege that advocating for children with disabilities is its primary mission, or that its membership is primarily composed of parents of such children. Contrast that with the union in *Postal Workers*, whose *raison d'être* was to protect its members' jobs—yet it could not demonstrate that it was within the zone of interests even under what the Supreme Court has long called the "generous review provisions" of the APA. *Lexmark*, 134 S. Ct. at 1389 ("[W]hat comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes.") (internal quotation marks omitted); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 156 (1970) ("In *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51, we referred to 'the generous review provisions' of that Act.").

Friends' expansive reading of the term "any person aggrieved" in the ADA is therefore without merit. Also without merit is Friends' contention that because it has Article III standing, it necessarily falls within the ADA's zone of interests as well. Doc. 136 at 3-6. Settled law has long distinguished between Article III standing and the statutory zone of interests. *See Lexmark*, 134 S. Ct. at 1386-88; *Bennett v. Spear*, 520 U.S. 154, 166-67 (1997); *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008). Indeed, the Supreme Court has rejected as "ill-considered" the suggestion that the term "any person aggrieved" in Title VII is coterminous with the outer boundaries of Article III standing. *Thompson v. N. Am.*

7

*Stainless, LP*, 562 U.S. 170, 176-77 (2011) ("If any person injured in the Article III sense by a Title VII violation could sue, absurd consequences would follow. For example, a shareholder would be able to sue a company for firing a valuable employee for racially discriminatory reasons, so long as he could show that the value of his stock decreased as a consequence. … We … therefore conclude that the term 'aggrieved' must be construed more narrowly than the outer boundaries of Article III."); *see also Richards v. NLRB*, 702 F.3d 1010, 1014 (7th Cir. 2012) (same). The pre-*Thompson* Second, Ninth, and Tenth Circuit cases to the contrary that Friends cites, Doc. 136 at 5-6, are likely no longer good law on that point and therefore are unpersuasive.

But is Friends nevertheless within the zone of interests of the ADA under the proper test? To answer this question, the court must focus on the "statutory provision[s] whose violation[s] form[] the legal basis for" Friends' complaint. *Postal Workers*, 498 U.S. at 523-24; *see also Bennett*, 520 U.S. at 175-76 ("Whether a plaintiff's interest is 'arguably … protected … by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question …, but by reference to the particular provision of law upon which the plaintiff relies.") (first two alterations in original). Although *Postal Workers* and *Bennett* are APA cases, *Lexmark* makes clear that this test applies to *all* federal statutory causes of action, not just APA suits. 134 S. Ct. at 1388 ("The modern 'zone of interests' formulation originated … as a limitation on the cause of action for judicial review conferred by the [APA]. We have since made clear, however, that it applies to all statutorily created causes of action; that it is a requirement of general application; and that Congress is presumed to legislate against the background of the zone-of-interests limitation, which applies unless it is expressly negated.") (internal quotation marks and brackets omitted). Accordingly, the ADA enforcement provisions "extend[ing] relief … to 'any person alleging discrimination …' [or to] 'any person aggrieved'

by discrimination," *Discovery House*, 319 F.3d at 279, must be interpreted in light of the *substantive* statutory provisions that the Board allegedly violated. *See Thompson*, 562 U.S. at 177-78 (holding that when applying the zone of interests test, Title VII's enforcement provision must be interpreted in light of its substantive provisions); *Bennett*, 520 U.S. at 175 ("In determining whether the petitioners have standing under the zone-of-interests test to bring their APA claims, we look not to the terms of the ESA's [(the Endangered Species Act's)] citizen-suit provision, but to the substantive provisions of the ESA"); *Todd v. Collecto, Inc.*, 731 F.3d 734, 738 (7th Cir. 2013) (looking to the substantive provision of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f, to determine who falls within the statute's zone of interests); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 866 (9th Cir. 2014) (same, for Title IX); *Air Line Pilots Ass'n Int'l v. Trans States Airlines, LLC*, 638 F.3d 572, 577 (8th Cir. 2011) (same, for the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq*.). As noted above, the substantive statutory provisions allegedly violated by the Board are Title II of the ADA and § 504 of the Rehabilitation Act, both of which proscribe discrimination against a "qualified individual with a disability."

Friends is obviously not an individual. Nor does it allege that its membership is primarily composed of, or that its primary mission is to assist, individuals or children with disabilities. That distinguishes Friends from drug rehabilitation clinics, for example, which many circuits—though not the Seventh, which has not weighed in, *see Discovery House*, 319 F.3d at 279 ("we have no need to agree or disagree with those courts")—have held fall within the ADA's zone of interests for the purpose of bringing suits challenging zoning regulations that prevent them from operating. *See A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 364 (4th Cir. 2008) (collecting cases from other circuits and stating that "a methadone clinic has standing under Title

II of the ADA to bring a claim based on injuries resulting from its association with the addicted persons it serves"). Even then the clinic would have "a claim to standing under the ADA and [the Rehabilitation Act] *only because* it runs a business which provides services—like dispersing methadone—to persons presumably covered by those Acts. If it were running a plumbing business, it could hardly claim relief under either statute." *Discovery House*, 319 F.3d at 281 (emphasis added) (holding that a methadone clinic seeking only monetary damages could not bring suit under the ADA because the relief would not "directly benefit the disabled"). Friends' allegations in the complaint show that its relationship to Trumbull students with disabilities was more like the hypothetical plumber's than that of a methadone clinic to addicts. Doc. 21 at ¶¶ 12, 73, 90. Put another way, Friends' "interests are so marginally related to … the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit" it to sue. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

In seeking the contrary result, Friends invokes one of Title II's implementing regulations, which provides: "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g). To support its contention that the regulation brings it within the zone of interests under Title II, Friends notes that the regulatory text is broader than the statutory text; the regulation protects not only "qualified individual[s] with … disabilit[ies]," but also *other* individuals and entities who have a known "relationship or association" with an individual with a disability.

Friends cites no authority to support its contention that a plaintiff who falls outside the zone of interests based on the *statutory* language can be pulled back within the zone based on a

*regulation*'s text. Yet the zone of interests inquiry merely "presents a straightforward question of statutory interpretation" that requires "using traditional tools of statutory interpretation," *Lexmark*, 134 S. Ct. at 1387-88—and in *City of Arlington v. FCC*, 133 S. Ct. 1863 (2013), the Supreme Court reiterated that the *Chevron* doctrine requires courts to defer to an agency's reasonable interpretation of any ambiguous statutory provision. *See id.* at 1868 ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*."); *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Because the zone of interests inquiry requires analyzing statutory text, it may follow that an agency's interpretation of that text deserves deference in conducting that inquiry. Then again, the Supreme Court has treated the zone of interests question as distinct from the *Chevron* question, which may suggest that answering the former is strictly a judicial task, with no deference due to the agency or its regulations. *See*, *e.g.*, *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 499 (1998) (resolving the zone of interests inquiry in one section of the opinion, and only then turning to the *Chevron* question in the next section as part of the merits inquiry).

The court need not untangle this knot, because even if Friends is within the zone of interests based on the regulation, it has failed to state a claim on the merits. To have violated the regulation, the Board must have "den[ied] equal services, programs, or activities" to *Friends* "because of the known disability" of Trumbull students with whom Friends is associated. 28 C.F.R. § 35.130(g). Yet Friends has not alleged that it was denied any services whatsoever; as noted, its only claim is that the school's closure would result in the denial of services to *students*. The Board never provided any "services, programs, or activities" to Friends, and Friends does

11

not allege that, as an entity, it was even entitled to request any services from the Board. Friends' reliance on the drug rehabilitation clinic cases therefore is, once again, misplaced, because in those cases the clinics were denied zoning permits—that is, they were directly denied something by the government. *See A Helping Hand*, 515 F.3d at 364; *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 407 (3d Cir. 2005); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 48 (2d Cir. 1997).

Similarly misplaced is Friends' reliance on *Rothschild v. Grottenthaler*, 907 F.2d 286 (2d Cir. 1990), in which parents of schoolchildren were permitted to sue a school district under the ADA. *Id*. at 290. In *Rothschild*, it was the *parents* who were hearing-impaired, not their children, and it was the *parents* who had requested the school to provide sign-language interpreters at "school-initiated" "parent-oriented" activities. *Id*. at 289-90. In other words, the plaintiff parents in *Rothschild* had alleged a denial of services to themselves, not to someone else. Friends, by contrast, has not.

To the extent that Friends bases its suit on the denial of services to the disabled students, its claim would be barred by the prudential third-party standing doctrine. *See Lexmark*, 134 S. Ct. at 1387 n.3; *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). To bring a claim based purely on Trumbull students' rights, Friends would have to show both that it "has a 'close' relationship with the" students and that "there is a 'hindrance' to the [students'] ability to protect [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *see also Powers v. Ohio*, 499 U.S.

400, 411 (1991). That the students themselves were once plaintiffs in this case easily defeats the second requirement, and with it Friends' bid for third-party standing. *See Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Products, Inc.*, 660 F.3d 988, 999 (7th Cir. 2011) ("The exception to this rule requires a party seeking third-party standing to show, inter alia, that the possessor of the right is somehow hindered from protecting her own interests. BRP has not attempted to make this showing, and thus, BRP cannot argue on behalf of the non-signatories' rights, whether or not those rights exist.") (citation omitted).

## Conclusion

For the foregoing reasons, Defendants' Rule 12(c) motion for judgment on the pleadings is granted. Friends' ADA and Rehabilitation Act claims are dismissed, and because the zone of interests inquiry is not jurisdictional, *see Lexmark*, 134 S. Ct. at 1387, the dismissal is with prejudice. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141, 1145 (11th Cir. 2014) (dismissing with prejudice ADA claims that failed to satisfy the zone of interests test); *Permapost Prods., Inc. v. McHugh*, __ F. Supp. 2d __, 2014 WL 3056506, at *7 (D.D.C. July 7, 2014) (citing *Lexmark* for the proposition that "[i]f plaintiffs' interests do not fall within that zone of interests, their claim will be dismissed with prejudice"). Given this disposition, the court need not reach Defendants' other arguments for dismissal. The court commends counsel for both sides for their outstanding representation of their respective clients, both on the briefs and at the preliminary injunction hearing.

March 3, 2015

United States District Judge